We'll move to our next case which is Rigoberto Velasquez-Banegas v. Lynch. Mr. Werman. May it please the court, good morning. The petitioner in this case, Mr. Velasquez-Banegas, belongs to the social group of Honduran men who have HIV. And because he has HIV, as we But by far the most important of these harms, and that's the harm I hope to focus on today, is the risk of violence he would face if he were perceived to be gay and thus to also belong to an additional social group of Honduran men who are perceived to be gay. This harm is the most important harm because the IJ in this case did recognize that gays in Honduras may face persecution and possibly even torture. So although the IJ made a number of errors that we argue require remand, the most important of these errors are the ones she made in arriving and coming to her determination that Mr. Velasquez-Banegas is unlikely to be perceived of as gay. As to that determination, the IJ made four findings. She essentially made four findings. For three of these, the IJ ignored or even failed to mention evidence central to Mr. Velasquez-Banegas' claim that spoke directly to those issues. And for the fourth finding, the IJ appears to have presumed that Mr. Velasquez-Banegas would not be open about his protected status. I wish to be clear about what we are asking in this case. The IJ has every right, and in fact has to, weigh evidence. What the IJ cannot do under this Court's cases and other Courts' cases is fail to consider relevant probative evidence central to an applicant's claim in coming to that determination. That was this Court's language in Mema v. Gonzalez, which we cited in the legal section of our brief, and that is consistent with this Court's holdings in Juan v. Mukasey and other Courts' holdings that we also cite. So what are the three findings that the IJ made while ignoring the central evidence that Mr. Velasquez-Banegas presented as to those issues? The first was that the IJ held against him, that he knew three people with HIV in Honduras, and that he and others didn't think they were gay. The government actually agrees with us on, at least partly, on this one, in the sense that there was no testimony in the record as to what other people, how other people perceived these three individuals. So the government agrees on that. But equally critically, Mr. Velasquez-Banegas gave an explanation, and again the IJ found him to be credible, as to what would distinguish him from these three individuals, that he is a middle-aged and unmarried man, and one of the three individuals he knew with HIV and didn't think were gay was a female, and all of them, I believe he testified, had partners. So again, the IJ is welcome, and in fact required, to weigh evidence, and she can say he knew three people with HIV, he didn't think they were gay, he gave this explanation as to why, I'm not persuaded for X, Y, and Z reason, but what she can't do is just make that finding and then completely ignore or fail to mention in that analysis that central explanation that he made. The second finding the IJ made in this regard is the IJ found that his family, his family and his community, were unlikely to think he's gay because they've known him for so long. The only evidence in the record, actually all the evidence in the record, corroborates Mr. Velazquez-Venegas' testimony, and testimony again that the IJ found credible, that he has a fear to tell his parents and his community because they will perceive him to be gay, and he fears the consequences, and the expert testimony... Was there any, you mentioned expert, was there any criticism of Portillo's evidence? I believe the government would say that the evidence is general, but I think the IJ considered the evidence and at least found it... Well, it would have to be general, wouldn't it? I mean, Portillo doesn't know this Velazquez, right? Yes. Is that what the IJ meant by general, that it wasn't about him specifically, that she hadn't, I don't know, talked to him or something? So there are two things she could have meant. That is one thing she could have meant. The other is when she said that the evidence was general in nature, she faulted the country conditions evidence for not having something she wanted to see. She wanted to see examples from Honduras of individuals who have HIV but who are not gay, who are mistaken to be gay. That's one example of it. She faulted the evidence, this is on page 12 of her opinion, and says none of that shows that happening. And we fully agree, Your Honors, we fully agree that that evidence, if it existed, would be powerful evidence. It would be powerful evidence. But as far as we know, that evidence, that kind of data does not exist in Honduras. So again, the IJ is welcome to look at the evidence that was presented and say, you know, for X, Y, and Z reason, because Mr. Velazquez-Penegas has these personal circumstances, I don't find it persuasive. But what the IJ cannot do under this Court's holding in E.O.V. Gonzalez is to say, well, I'm not going to give any weight to these country conditions reports, to this evidence, because I want to see X. But X is an exaggerated notion of what's available in a country like Honduras, in a poor country like Honduras, where these studies don't exist, this data doesn't exist. So, and especially since the coup- What specifically did the IJ want? The IJ wanted examples of individuals in Honduras who have HIV but who are not gay, being mistaken to be gay, being perceived of as gay. And again, that would be powerful evidence, but as far as we know, that detailed- Did Portillo talk about that at all? So Ms. Portillo testified to a general perception that exists in Honduras, that those with HIV are gay. And then what Mr. Velazquez-Penegas, the way he tried to shore that up, with country conditions evidence, was to provide a report, which we cite in our brief. One report is at AR 590-91 from a Canadian human rights group that said people blame gays for HIV. They have an animus of that, and that is towards gays because of that. And that is some explanation corroborating Ms. Portillo's testimony. It is true that some people have HIV who are not homosexual. Yes, it's absolutely true. And it should be stated very plainly for the record that HIV is not a gay disease. But historically, and I think globally, it has been perceived, rightly or wrongly, to be that. And that is what the experts- Well, it's most common, I think, among homosexuals, isn't it? Male homosexuals. Yes, so that is part of the corroborating- Drug users, needles, sharing needles, that's another- That is, in fact, another way to get HIV, and heterosexual sex is a way to get HIV. There are other ways to get HIV, but the testimony that was provided was that there isn't a perception that those with HIV must be intravenous drug users. Rightly or wrongly, globally and historically, and in Honduras, as the record shows, people have perceived HIV to be a gay disease. And that was the testimony of Ms. Portilla. That was what was written in the report. So the IJ didn't reject that, didn't disagree with the proposition, but felt there had to be evidence about him specifically? Is that the idea? I don't think that's what the IJ meant when she rejected the general evidence that we said. I think what she wanted was those examples of individuals, other individuals, that had been mistaken to be gay because they had HIV. And we think that's impermissible, in the same sense that in EOV Gonzalez, what the IJ had wanted, the IJ wanted to see a membership roster, a membership roster, that that individual was part of the following gang. And this court said, no, no, no, you may not be persuaded by all that other evidence, but you can't just ignore that evidence because you want to see something that just isn't reasonably obtainable in that country. So she would have liked someone to be brought in who would testify that he was HIV positive and people thought he was homosexual, but he wasn't? Would that have made her happy? I think that would have made her happier. Yes, of course, there was always situations you can imagine in which there would be stronger evidence. But, of course, no one would do that. I mean, no one would come in and make an offer testimony like that, would they? I don't know. That would be embarrassing. They would or wouldn't. If you can imagine a situation if Mr. Velazquez-Benegas had felt brave enough at this point in time while he's still in the United States to confide in a cousin and his cousin wrote a letter saying, oh, I don't think he's gay. That would have been evidence contrary to our position that she could have relied on and maybe the cousin would have testified, I do think he's gay, even though I've known him for so long. I don't know exactly what the IJ had in mind. But it seems to us, at least when it comes to the general nature of the country conditions report, just corroborating this general perception by showing that a gay man is ten times more likely to have HIV by citing to that Canadian human rights report that said there's animus toward gays because of HIV, because people believe gays started that disease in Honduras. Again, she can discount that if she does so fairly, but she can't discount that because she wants to see something, something like an example, him going out and finding an example of someone mistaken to be gay, perceived to be gay who isn't because he has HIV, and that was not reasonably obtainable. And that's one of the three things, in addition to the three people that he knew who had HIV. That's one of the findings she made, and she just completely ignored that evidence because she wanted something that wasn't reasonably obtainable. And the third one that I haven't mentioned yet is that she concluded that he wasn't, his family wouldn't perceive him to be gay because they've known him for so long. She just said all the record, as I mentioned before, corroborated his fear, his fear that they would think that. And all the IJ did was that. She swept that all under the rug and said, well, I just can't imagine that his family. That I just what I'm saying? I just can't imagine that his family would really think that. They've known him for so long. But putting aside the fact that leaving in your mid-30s is still unmarried without HIV and coming back in your mid to late 40s still unmarried and now with HIV, putting that aside, if there was some, like that letter from a cousin that does it in the hypothetical I mentioned, if there was something for her to hang her hat on to say, well, they knew he had HIV and didn't think he was gay, that would be fair game. No doubt about that. But what she can't do is just supplant all the record, the evidence that there is in the record, and replace it with a mere guess, a mere guess, a conjecture as to what they must think because surely they think like me or like my parents did. And I don't know what the IJ was thinking when she made that determination. Have you found other cases where a person was granted relief based on imputed membership in a social group to which they deny membership? I mean, I couldn't, but we couldn't. So there are cases saying that you can state a claim for imputed membership in a political group or a religious group for religious opinion or political opinions, but it is true. And I don't know of any cases that extend, have extended that to social group, but I think the immigration laws in the asylum and withholding context protect these groups equally. And I can't discern a moral reason that there should be a legal difference between people who have a protected social group imputed to them. Who have a what? People who have a protected social group imputed to them versus a political opinion. I think the immigration laws, and this actually goes to another area we think the IJ made. I think the immigration laws in this context, the thrust of the laws is to say people have a right to be open about certain characteristics, and that includes social groups. It also includes political opinion and religious opinion. And the law then requires a judge to ask, what will happen to you if you are open about those things? That the law requires you to be open about. Will you face persecution or not? And if you do face persecution, you state a claim. And so the fourth finding the IJ made was that his community, or he was unlikely to run into anybody he knows because he was going to seek treatment four hours away. The only implication that can be drawn, the only way that that finding would be relevant to the IJ's analysis is if she drew a conclusion from that, that therefore he somehow would be able to keep his HIV status concealed. But his HIV status is itself also a protected status. And as I just said, I think the laws require that the IJ ask, what happens if you are open about this thing you have a right to be open about? And I don't think that the IJ did that. I see that the white light is on, so I'll reserve the balance of my time. Thank you, Mr. Worman. Ms. Chang? May it please the court. My name is Linda Chang and I represent the Attorney General in this case. Now I wanted to address something that has been raised at this point. Could you speak a little louder? Sure. Thanks. There's been a lot of discussion about what the IJ would have wanted to hear and what evidence she would have wanted to see presented. However, I don't think that is the right way to look at the evidence in this case. Rather, it's more like the glass is half empty versus half full. So it's not what she would want, but rather what has Petitioner presented to the agency at this point? She seems to have rejected his argument regarding imputed homosexuality because it was general in nature and not specific to him. But he did testify that people might think he is gay not only because he is HIV positive, but because he's never married, he's middle-aged. What more specific evidence could he have reasonably provided? So in order to answer that, I'm going to go back to this visualization of the evidence. And so the idea is Petitioner is responsible for bringing forth the evidence to meet this burden of proof. And so in order to meet that level, he has to present it. It's not whether the immigration judge is looking for anything specific, but if he fails to meet that bar. No, but Judge Rovner's question is what more evidence would be needed? And how would it be obtained? So addressing this specific... She didn't question, the immigration judge didn't question Portillo's evidence. Is that correct? That is correct. The immigration judge did not question her testimony.  Does not get him any individualized evidence of risk of harm. I don't understand what you're saying. Because he did explain, look, I have HIV. I've never married. I'm middle-aged. I can't fathom what more this man could have done. So I'm going to run a parallel to another case that this court recently decided, which was Lozano Zuniga. And in that case, it's also a particular social group. And there was no past persecution. However, the Petitioner was arguing that there was a fear in the future, that when he returned to Mexico, he would be perceived as wealthy. And there, this court found that because the Petitioner did not present any specific facts showing that he would be singled out for persecution, that there was only generalized unrest in general, kidnappings by the gangs in Mexico. This was not sufficient to show that he would then be facing persecution. So similarly, this is a case... Is it more likely than not that he's going to be subject to persecution if he's returned to his country of origin? And that ordinarily cannot be decided on the basis of detailed information. It's always a matter of probabilities. He's going back to some violent area in Central America. And there have been maybe members of his family murdered and so on. Or people like him have bad things have happened to them. It's rare that they can have specific information about, you know, everything about him and who knows him and all that. That's not required. Your Honor, to the contrary. I would argue that it is required by the statute, that there is some showing that he presents evidence that it is more likely than not. That what? That he presents evidence that it is more likely than not that... Well, Judge Rovner just mentioned some of the evidence, right? Correct. We know this is a culture that's hostile to homosexuals. We know there's a correlation between HIV positive and being homosexual. We know that there's suspicion based on the fact that he's, you know, in his 40s and unmarried. Why doesn't that add up to, you know, more likely than not, not certain of course, but more likely than not that he will be persecuted if he's sent back? What's missing? I can't speculate as to what is missing in terms of the evidence. But you have to. I mean, you have to. You have to give us something to hang our hat on. We don't know. Right. So what this Court must look at is what Petitioner did present in order to satisfy the requirement that he show that it is more likely than not that he will be persecuted. That's what we're talking about. Correct. But you base that on generalities often rather than on the specifics of the person. If he's a member of a group that's despised and can be threatened and murdered and so on, that's evidence. Even if you don't know what particular threats have been made against him and so on. However, this Court has found that that is not sufficient to meet the burden of proof. What is not sufficient? Everything that you've discussed, which is what Petitioner has presented in this case, is insufficient to meet his burden of proof as required by the statute, which we go back to this other case of Lozano-Zuniga, which this Court decided that in that proposed particular social group of men returning from the United States to Mexico. Well, what more evidence is required in this case? That is something that I cannot speculate to because the immigration judge does not. But you're asking us to speculate. You see where we're mixed up. I understand, Your Honor, is trying to ask about that. You can't tell us what evidence is required to make his case for him? I am not responsible for making his case. Of course you're not responsible. You ought to know, though, you ought to be able to tell us what is missing from the record that is necessary to show that he's entitled to asylum. What is missing is that he hasn't shown evidence that makes it more likely than not that he would be persecuted. No, no, you're going in circles. What is that evidence that would say more likely, that would show more likely than not, apart from Portillo's evidence? It is not my place to say that. However, I would regard... You're in that business about not your place. I regard that as simply a default. You're refusing to answer our questions. You're either not prepared, or your supervisors don't allow you, or what? You're just not being responsive. I apologize, Your Honor, for that appearance, but I do not want to commit a Chenery violation. In this business, if it's not your place, it's not your place to discuss evidence, to tell us what evidence is required by this guy? Your Honor, I'm more than happy to discuss the evidence in this case. Whatever evidence that... No, but the whole point is there's missing evidence, right? I thought that was the point. He needs to present more evidence. What is the evidence he needs to present that he hasn't presented? There may be no additional evidence. I do not know that. However, what is in the record... Forget it. You're not telling us anything. Your argument is totally empty. You're saying nothing. To the contrary, Your Honor. I would suggest that the evidence in the record does not meet his burden of proof because it actually goes in the opposite direction. Portillo's evidence is in the record. Why isn't that enough? It is generalized evidence that doesn't apply any facts specific to the petitioner. That what? Her testimony is expert testimony on the general conditions of Honduras without actually applying the specific facts of petitioner's case. No, no, no. She is saying that people with HIV are tortured and utter pariahs, and he has brought forth all of his characteristics that would lead to that kind of behavior. He has HIV. He's never married. He's middle-aged. He's terrified to go back there. Terrified to go back there. The government has to be able to tell us what more this man can do under these terrible circumstances. I understand that the country conditions do not look good, especially compared to the United States. However, returning to a country with lesser medical services or employment opportunities is not alone a basis for persecution. I'm sorry, relief from removal. Here, petitioner has attempted to shoehorn his medical illness into one of the protected grounds for refugee status. Now, he has chosen it to be a particular social group. Now, even then, he must satisfy all the requirements that are pertinent to that. So he must show that this is a group which we have recognized. However, then, he must show membership, which, Your Honor, question, if he wants to use this as a group, why would he then deny membership into it? This makes it difficult to make that his basis for withholding here. Now, on the other claim of a particular social group for HIV-positive individuals, he can't show that there is a nexus to any harm that he may experience as an individual in this group that will be specifically on account of him. So he's showing a probability as someone who would be identified as a likely homosexual. How are homosexuals regarded in Honduras? Well, the country reports... How are they regarded in Honduras? They are not as good as in the United States. However, that alone is not sufficient basis. It's certainly relevant. It's relevant, but here... Tell us something about Honduras. What kind of crime rate do they have in Honduras? I do not know the answer to that off the top of my head. Well, if I told you it was the highest in Central and South America, what would you say? That it is notorious for its crime rate? That it has a terrible crime rate? You don't know that. You don't know anything about Honduras. I cannot speak to that because that is not... Well, you ought to know, right? He's concerned about being sent back to Honduras. Now, isn't it relevant what the crime rate is in Honduras? Shouldn't that be part of your preparation, that you can tell us something about whether Honduras is a safe place or maybe you're going to be teased about being homosexual, but you're not going to be killed? Your Honor, what the agency needed to analyze was whether Petitioner actually satisfied the requirements for withholding of removal. But isn't the crime rate in a country to which someone is ordered deported, isn't that relevant? It's relevant, but it's meaningless if he can't satisfy all the other requirements. But you don't know what it is, of course. You seem to think that any evidence that's not specific to him is simply irrelevant. I would not go so far as to say that it's irrelevant. However, he must prove... So you totally dismiss the Portillo evidence as irrelevant. That is not true.  ...that she has summarized Ms. Portillo's opinion and has used it in considering whether or not Petitioner has met his burden of proof. And here she found that Petitioner was lacking on that regard. But, of course, the law does not permit a judge to require that a petitioner hide a protected status. This is true, Your Honor, and this is not what the judge decided. Petitioner himself stated that he wanted to keep it a secret and he did not want to reveal it to his family and at the moment of the merits hearing he had not yet. And so understanding that that was the parameter that he was presenting his particular social group, the IJ had to use it. And so using that in conjunction with the other evidence, it made it less likely that there would be any imputation of homosexuality based off of the facts that Petitioner himself presented in that he wanted to keep it a secret, his HIV status, in that the people that he knew with HIV, he did not consider them as homosexuals. The additional evidence that he did not plan to spend any time in the LGBTQ areas, these were the pieces of evidence that he presented to the immigration judge and she discussed how these pieces did not show that there was a likelihood of imputation. Didn't she apply to exacting a standard of persecution on the basis of HIV, requiring compelling evidence of persecution here? Your Honor, just the fact of having a terrible illness, which we recognize is not a basis itself for relief from removal and therefore in applying the rest of the requirements. But when you put everything else together with it, you have a mosaic. Unfortunately, in this case, that mosaic does not reach enough evidence to show that it is more likely than not that he would be persecuted on account of this particular social group. And there has been no case that shows that so long as a petitioner can show that he's a member of a group that is ill or has some life-threatening illness, that is sufficient to qualify for relief from removal. Well, but see, again, you only mentioned one piece of the mosaic. The other pieces are that he's unmarried and he's middle-aged. Your Honor, the fact that… And that may very well have a lot more meaning in Honduras, a very religious country and a place where homosexuals are pariahs. Your Honor, that piece of evidence was considered by the immigration judge and that it is summarized in her decision, so it was not ignored as petitioner alleges. However, if that is the linchpin for this claim, that itself cannot compel a contrary conclusion. There is no other record of evidence that shows that those factors of being middle-aged and unmarried would then automatically put you into this category. Not a matter of automatically and no other evidence. It's putting everything together. And even putting everything together, it does not rise to the level that he has met his burden of proof. Okay, well, thank you very much, Ms. Chang. Mr. Worman, do you have anything for me? Just a few minor points, Your Honor. I would start by stating that HIV is not any other illness. I'm sorry, what? I would just start by stating that HIV is not just any other illness. There is no doubt that Honduras has a tough time with their medical system and that people of all sorts of conditions have trouble getting care. But HIV, the HIV population has historically had their condition associated with something else, and that something else has generated kind of animus. And I'll also add that Honduras has the highest crime rate in the Western Hemisphere. I'm sorry, the what? Honduras has the highest crime rate in the Western Hemisphere. Right, that's what I'm saying, too. Since the 2009 coup. More than Chicago, huh? We are in the Western Hemisphere, Your Honor. And since the 2009 coup, the LGBT community has been a particular target of that with hundreds of murders a year, and the country conditions reports say that over half of those are committed by police themselves. So I don't know what persecution for them would be if that's not it. But I also wanted to clarify that Mr. Velazquez-Venegas did not say he would hide his status. He said he was afraid. He was afraid to tell his family. But if he were there, he testified, it's AR-175, that he didn't see a choice but to come out about his HIV status because he has to take a bus four hours away and leave his family for a whole day. And so I don't think that's right. And on the point about relief, the government's counsel stated that the evidence doesn't compel something. We are not stating here today that the evidence has to compel a particular conclusion. What we are saying is that the IJ has to give Mr. Velazquez-Venegas a fair shake when she does her job of assessing the evidence, and to do that she can't just not mention the central facts that he thought were important to his case and the evidence, the general evidence he provided, because she wanted to see something that, quite frankly, was not reasonably obtainable. Thank you. Not reasonably? Obtainable from a country like Honduras. Obtainable, thank you. I apologize for not speaking more clearly. I know. I apologize for not hearing you. Okay. Thank you, Mr. Worman. And, again, thank you, Ms. Chang.